131 So.2d 713 (1961)
Thomas Brooks JONES, Appellant,
v.
BOARD OF CONTROL of the State of Florida, Appellee.
No. 30975.
Supreme Court of Florida.
June 23, 1961.
*714 Clifford C. Alloway, Coral Gables, for appellant.
Richard W. Ervin, Atty. Gen., Ralph E. Odum and James G. Mahorner, Asst. Attys. Gen., for appellee.
THORNAL, Justice.
Appellant Jones seeks reversal of a final judgment denying to him recovery for an alleged breach of his contract of employment as a professor at the University of Florida.
Numerous points for reversal are assigned but the principal contention revolves around the validity of a rule of the appellee Board which prohibits its employees from seeking election to public office.
The appellee, Board of Control, which supervises the operations of the State Universities, employed the appellant Jones as an interim associate professor of law at the University of Florida for the academic year 1959-1960. Compensation was to be paid monthly over a ten month period although appellee's teaching duties started on September 6, 1959 and would have terminated in normal course on June 6, 1960. The contract between the parties was evidenced by a document designated "notice of contract for academic staff" which was approved and accepted by the appellant. The notice of contract, likewise, included the provisions of the Constitution of the University of Florida, as well as the rules promulgated by appellee Board of Control.
On February 18, 1960, the dean of academic affairs, by letter, informed Mr. Jones that the filing of qualifying papers establishing eligibility and intention to run for public office would be considered as conclusive evidence of the breach of a Board of Control rule which prohibited its employees from seeking election to public office. On February 29, 1960, Professor Jones filed with the Secretary of State, his papers qualifying to seek the nomination for the office of circuit judge in the next ensuing primary to be held on May 3, 1960. On the next day Mr. Jones was called to the office of the President of the University and was informed of his dismissal because of his violation of the rule which we shall later quote in full. He was paid through March 1, 1960. Two days later Mr. Jones demanded a hearing by a faculty committee which he claimed to be a privilege granted to him by the University Constitution. In consequence of a hearing held March 9, 1960, the faculty committee found that the President had acted within the authority of the rule in question. Thereafter on March 25, 1960, appellant was accorded a hearing by the appellee Board of Control, which thereupon also affirmed the President's action. Claiming a breach of the employment contract for various reasons, which we shall discuss, Mr. Jones brought this action seeking compensation allegedly due him for the remainder of the contract term subsequent to March 1, 1960. For all practical purposes, the parties stipulated to the salient facts. The trial judge entered a judgment upholding the validity of the rule in dispute and sustaining the action of the University officials in dismissing appellant Jones. Reversal of this judgment is now sought.
We shall undertake to dispose of a number of the incidental questions preliminary to our ultimate discussion of the constitutional question raised by the appellant.
*715 Article XV, Section 5, of the Constitution of the University of Florida provides as follows:
"Dismissal of a member of the Academic staff as distinguished from termination of appointment as defined in Article XVI may not be effected except for serious cause and on the basis of written and specific charges filed by an administrative officer of the part of the University directly concerned or by the President. In answer to such charges the faculty member shall have a hearing before a committee of the faculty appointed by the President. Opportunity shall be given the accused to challenge for cause the appointment of any faculty member to this committee. At this hearing and at any hearings of its own that the Board of Control may wish to conduct, the defendant shall be allowed the benefit of counsel of his own choosing at his own expense. Except in cases of flagrant offense, dismissal shall not become effective until at least sixty days after action by the Board of Control. "In case of flagrant offense the President may suspend a member of the academic staff from performance of his duties and, after an expeditious hearing, recommend immediate dismissal to the Board of Control. When dismissal is ordered in such cases by the Board of Control it shall be effective at once."
The Board of Control rule, which prohibits its employees from seeking election to public office provides as follows:
"(1) Employees under the jurisdiction of the Board of Control are prohibited from seeking election to public office. Any employee desiring to engage in a political campaign for public office shall first submit his resignation to the Board."
The trial judge concluded that applicable statutes, the University Constitution, the valid regulations of the appellee Board of Control and the faculty handbook, specifically referred to in the notice of contract, together with the provisions of the last mentioned document, comprised the composite contractual arrangement between Professor Jones and the Board of Control. In so holding, the trial judge ruled correctly. Saunders v. Cities Service Oil Company, Fla. 1950, 46 So.2d 597; Florida Livestock Board v. Gladden, Fla. 1954, 76 So.2d 291; United States v. Carter et al., Fla., 1960, 121 So.2d 433.
Professor Jones insists that he was denied procedural due process because of the alleged failure of the University officials to meet the requirements of Article XV, Section 5, University Constitution, supra. He claims that they failed to comply with the rule regarding the filing of specific charges, the hearing before a faculty committee and the postponement of ultimate dismissal until at least sixty days after final action by the appellee Board of Control. We find little merit in this contention. In the first place, if the rule pursuant to which the appellant was dismissed is valid, then he breached his contract by qualifying to seek election to public office. When he filed his papers and paid his qualifying fee, which was substantial, he certainly proclaimed his desire and intention to engage in a political campaign for public office. The rule in effect required that he submit his resignation to the Board before doing so. Inasmuch as this is an action on the contract, Mr. Jones will not be permitted to recover for his own breach. We agree further with the trial judge when he concluded that the willful conduct of the appellant in announcing his specific and well-planned intention to violate the rule of the appellee Board constituted not only a "serious cause" but actually a "flagrant offense", within the provisions of Article XV, Section 5, of the University Constitution, supra. As we read the applicable provision, such an offense justified immediate suspension by the President and a prompt hearing with immediate dismissal by the appellee Board. So far as procedural due process *716 is concerned, we have little difficulty in concluding that the appellant has enjoyed a full measure in the instant matter.
It is next asserted that the rule regarding the political activities of employees of the appellee Board was beyond the contemplation of the Legislature in the enactment of Section 240.04, Florida Statutes, F.S.A. That legislative act provides in part, "the Board of Control has jurisdiction over the complete management and control of all the said several institutions, and each and every of them, to wit: The University of Florida * * *." The statute further provides that the Board is "invested with full power and authority to make all rules and regulations necessary for their governance, not inconsistent with the general rules and regulations * * * made at any joint meeting of the said board with the state board of education." The appellee Board by the same statute is empowered "to appoint all the managers, faculty, teachers, servants, and employees, and to remove the same as in their judgment and discretion may be best." A more comprehensive legislative authorization to an administrative agency, such as the appellee, could hardly be conceived. It is perfectly clear that the Legislature has endowed the appellee Board with extensive powers to operate the State's institutions of higher learning subject only, of course, to the specific limitations of the authorizing statute. Assuming the rule in question to be constitutionally valid, as we hereafter find it to be, there is no doubt whatever but that it is well within the limits of the legislative prescriptions announced in Section 240.04, supra.
Appellant asserts that the rule in question does violence to the legislative policy suggested by Section 104.31(1)(c), Florida Statutes, F.S.A. Chapter 104, Florida Statutes, F.S.A., is a segment of the State Election Code which defines various violations and prescribes penalties therefor. Section 104.31, supra, condemns certain types of political activities by State officers and employees. It is correct that Subsection (c) provides that it shall not be construed so as to prevent any person from becoming a candidate for any elective office. An examination of Chapter 25138, Laws of Florida, 1949, (House Bill 520) will reveal that Subsection (1)(c) did not contain the provision specifically authorizing the various officers or employees to seek public office. Subsequently, this authority was added within a very few days at the same legislative session by the enactment of Chapter 25360, Laws of Florida, 1949. The perfectly obvious legislative reason for the addition of the amendatory provision was the realization that by the original enactment the legislators had, in effect, precluded themselves and every other office holder from seeking re-election or participating in his own re-election campaign. The progress of the enactments reflected by the legislative journals, as well as the published reports given currency at the time, support this conclusion. The legislators very sensibly added the provision in order to avoid the dire consequence of legislating themselves and all other elective officials completely out of office. Nothing in this statute can conceivably be stretched to suggest a legislative condemnation of the subject rule, legitimately promulgated pursuant to legislative authority by an agency of the Legislature's own creation.
We now proceed to the assault on the rule on the basis of appellant's constitutional claims. It appears to be the position of Professor Jones that the restriction imposed upon college professors prohibiting them from seeking public office encroaches on their rights as citizens to run for public office and impinges on their liberty generically described as "academic freedom."
Nowhere in the briefs are we supplied with a definition of the term "academic freedom" or the outer limits thereof if any are recognized to exist. This apparent shortcoming in the otherwise excellent briefs is quite understandable for the simple reason that in none of the authorities mentioned *717 and in none of the authorities discovered by our own research is the term given any definitive meaning. As contended for by the appellant, however, we understand the expression "academic freedom" to comprehend a claimed privilege of scholars and academicians and teachers generally to teach without restriction either to subject matter or as to limitation on collateral activities. Should we adopt literally the position of the appellant, it appears to us that we would be compelled to concede that a license to teach in a public school system is subject to no regulations whatsoever regarding either the nature of the subject matter to be taught or the time and effort that may be required to be devoted to the classrooms.
We should not lose sight of the fact that Professor Jones is insisting upon continued public employment in a public institution in the face of a violation of a rule apparently in full force and effect when he was engaged for the service and which we must assume that he knew, or should have known, particularly in view of his professional stature as a lawyer and a law professor.
Although we might appropriately do so, we find it unnecessary to approach a solution through the narrow corridor suggested by Justice Holmes in his descriptive dictum that "The petitioner [a policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. City of New Bedford, 155 Mass. 216, 29 N.E. 517. To this end, we do not find it necessary to restrict our perspective to the limited concept, in a measure now outmoded, that a person has no constitutional right to government employment. We think that we can dispose of our problem on a much broader plateau of reasoning with the view that any right which an individual does have to work for the government or to continue in the public employ or to seek public office must necessarily be subject to all reasonable rules and regulations promulgated by the government in the interest of the public and for the well-being of the public services. The appellant claims the right to teach in a State institution pursuant to his contract. The appellee simply replies with the assertion of the power to promulgate reasonable regulations of the appellant's conduct of his employment in the interest of the public and particularly the students who depend upon the professor for their instruction.
Here the appellant contends that the rule of the appellee Board which prohibits its employees from seeking election to public office denied to him substantive due process, contrary to the provisions of the First and Fourteenth Amendments to the Constitution of the United States, and Sections 12 and 13 of the Declaration of Rights, Florida Constitution, F.S.A. To this end it is contended that the Board's rule, when applied to the plaintiff, unreasonably interferes with his right to seek work in a capacity for which he had been professionally trained, to wit: the position of circuit judge. Likewise, asserts the appellant, the rule unreasonably interferes with his right to work and earn a living as a teacher. Implicit in these contentions is a recognition of the limitations thereof. In each instance the plaintiff contends that there has been an "unreasonable" interference with the asserted right. Necessarily this leads to a conclusion that if the rule does not unreasonably interfere with the ascertained right, then the rule must be upheld. Appellant's argument necessarily recognizes a truism to the effect that the right to teach or the right to seek public office is not a constitutional absolute. Each of the privileges is subject to reasonable restraint and reasonable conditions. The test of reasonableness in either situation involves a consideration of the nature of the right asserted by the individual and the extent that it is necessary to restrict the assertion of the right in the interest of the public.
Appellant places considerable reliance upon the decision of the Supreme Court of the United States in Meyer v. State of Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042. There, the state statute which was *718 held invalid, prohibited the teaching of a foreign language in the school system. Meyer, a teacher of the German language in a parochial school, contended that this placed an unreasonable restriction on his freedom to exercise a legitimate vocation for which he had prepared himself. The Supreme Court of the United States agreed, holding that there was no reasonable justification in the public interest for the arbitrary prohibition against the teaching of foreign languages.
The holding in Meyer, however, is far removed from the rule applicable in the case at bar. Here, the rule promulgated by the Board of Control had no relevancy whatever to the subjects which Professor Jones might teach. It dealt merely with his right to teach and simultaneously carry on a political campaign for an elective public office. The rule prohibits no one from teaching. Neither does it prohibit a teacher from running for public office. It merely provides that he cannot do both simultaneously. There is adequate justification for the rule in the public interest, as well as in the interest of the University student body which looks to its professors for instruction. As the circuit judge points out, there are many reasons why the appellee Board would be justified in placing restrictions on the University faculty in connection with political campaigns. The demands upon the time and energies incident to a warmly contested campaign for an important public office would necessarily affect the efficiency of the candidate; the potential effect upon the students, not only as the result of such inefficiency, but also in the nature of the political influences that might be brought to bear upon them would be further justification; the potential involvement of the State University which is dependent upon public support from all political elements would be another major consideration supporting the reasonableness of the rule. Although appellant suggests that he might well have conducted his campaign in the evening so as not to interfere with his professorial duties, the reasons which we have epitomized above would still apply. Moreover, anyone who has ever been associated with a heated political campaign well knows that it involves handshaking, speech making, telephone calling, letter writing, and door to door campaigning from morning well into the night. To anyone familiar with the practical aspects of American politics, it is asking too much to expect him to agree that success in a strenuous political campaign can be achieved merely by appearances at Saturday afternoon fish fries or early evening precinct rallies. The result simply is that it would be extremely difficult for a university professor to conduct his classroom courses with efficiency over a period of eight to ten weeks while simultaneously "beating the bushes" in search of votes to elevate him to the position of a circuit judge.
We think that the decision of the trial judge and our own conclusion is clearly supported by the opinion of the Supreme Court of the United States in United Public Workers of America v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754. There, the highest Court sustained the constitutionality of the so-called Hatch Act, 18 U.S.C.A. § 594 et seq., 5 U.S.C.A. § 118i et seq. which prohibited government employees in the Civil Service from seeking election to public office. We think it unnecessary to elaborate upon the details of that decision. It is perfectly clear that the United States Supreme Court found adequate justification for a requirement which would preclude participation in political campaigns in the interest of saving the employees against political retaliation and providing job security.
Similarly, in Beilan v. Board of Public Education, School District of Philadelphia, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414, the Supreme Court of the United States recognized the delicate responsibility assumed by a teacher and decided that he could be held accountable for his collateral associations which might be considered as having harmful effects upon the school system. The same effect, was the decision *719 of the United States Supreme Court in Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517.
We, ourselves, have sustained the validity of Section 104.31, Florida Statutes, F.S.A., which places restrictions upon the political activities of various public employees. State v. Stuler, Fla. 1960, 122 So.2d 1.
We hold that the rule of the appellee Board here under assault is constitutional. When appellant willfully ignored the rule he breached his pre-existing contract with the appellee. Having breached the contract himself, appellant is not entitled to the recovery sought. The judgment in favor of the appellee is affirmed.
THOMAS, C.J., and TERRELL, HOBSON, ROBERTS, DREW and O'CONNELL, JJ., concur.