LYONS, Justice.
 

 Several legislators who were also employed in or who desired to be employed in the two-year-college system initiated this action in the Montgomery Circuit Court challenging two policies adopted by the State Board of Education (“the Board”). This is the third time this action has been before this Court. On December 28, 2008, this Court dismissed the first appeal as moot. On November 25, 2009, this Court reversed a summary judgment for the employees and remanded the action to the trial court for further proceedings. See
 
 Byrne v. Galliher,
 
 39 So.Bd 1049 (Ala. 2009). On May 5, 2010, the trial court entered a judgment declaring that the challenged policies violated several statutory and constitutional provisions; the court declared the policies void and permanently enjoined the Board and the other defendants — the Department of Postsecondary Education and its chancellor and the members of the Board — from enforcing them (all the defendants are hereinafter referred to collectively as “the Board defendants”). We reverse.
 

 Factual Background and Procedural History
 

 The facts and much of the procedural history relevant to this appeal were summarized in this Court’s opinion in
 
 Byrne:
 

 “On August 23, 2007, the Board adopted the two policies at issue in this case: Policy 609.04 and Policy 220.01. Policy 609.04, entitled ‘Flexible Work Schedule,’ provides:
 

 “ ‘All Alabama College System[
 
 1
 
 ] employees engaged in outside employment or activities during their normal work hours must request personal, annual, or unpaid leave in accordance with State Board policy. Unpaid leave may be granted only in accordance with and for the reasons outlined in Policy 611.01: Leaves Without Pay.’
 
 [2]
 

 “Policy 220.01 prohibits the two-year-college system from employing elected State officials or entering into certain contracts with elected State officials.
 
 [3]
 
 Specifically, Policy 220.01 provides:
 

 “ ‘Employing authorities may not employ any elected state official. However, an elected state official who was actively employed as of the effective date of this policy may be continued in the same position of employment until the expiration of his or her term of office then in effect. In such case, the elected state official shall not be eligible for promotion, advancement, or any non-statutory pay raise or bonus during his or her term of office.
 

 “ ‘Employing authorities may not enter into any personal or professional services contract under which services are to be performed by an elected state official.
 

 “ ‘Employing authorities may not enter into any other type of contract or business relationship with any corporation, partnership, company, joint venture, or other business entity in which any elected state official holds a
 
 *365
 
 financial interest of five percent (5%) or more.
 

 “ ‘Notwithstanding the foregoing, any contract of the kind described above which is in existence as of the effective date of this policy need not be immediately terminated but shall be terminated on the earliest date for which the contract may be terminated without penalty, and no such contract may be renewed, extended, or amended to expand the term or alter the termination procedure or penalties.
 

 “ ‘An employee who is elected or reelected to an elected state office after the effective date of this policy must submit his or her resignation effective on or before taking office. Nothing in this policy shall be construed to restrict or limit an employee’s right to campaign for elected state office, provided that campaign-related activities are conducted while on approved leave or on personal time before or after work and on holidays, consistent with state law.’
 

 “The plaintiffs filed the present action on August 24, 2007, the day after the Board adopted the policies. Most of the plaintiffs are members of the Alabama Legislature who were also employed in or who desired to become employed in the two-year-college system.
 
 [4]
 
 The plaintiffs sought (1) a judgment declaring Policy 609.04 and Policy 220.01 void under Alabama law and (2) injunctive relief prohibiting the defendants — the Department of Postsecondary Education and its chancellor, Bradley Byrne,
 
 [5]
 
 and the Board and its members — from implementing Policy 609.04 and Policy 220.01 (all the defendants are hereinafter collectively referred to as ‘the Board defendants’).
 
 [6]
 
 The plaintiffs challenged the policies as, among other things, conflicting with provisions of the Alabama Administrative Procedure Act, § 41-22-1
 
 et seq.,
 
 Ala.Code 1975 (‘the AAPA’), the Fair Dismissal Act, § 36-26-100
 
 et seq.,
 
 Ala.Code 1975, and § 17-1^4, Ala. Code 1975. The plaintiffs also contended that the policies were unconstitutional.
 

 “After the Board defendants filed an answer to the complaint, the plaintiffs moved for a summary judgment on the ground that Policy 609.04 and Policy 220.01 had been adopted in violation of the AAPA. The Board defendants filed a counterclaim seeking a judgment declaring that Policy 609.04 and Policy 220.01 were valid and that the policies did not conflict with the AAPA or with any of the other provisions of Alabama law cited by the plaintiffs.
 

 “Along -with a brief and evidentiary submissions, the Board defendants filed a cross-motion for a summary judgment as to each of the plaintiffs’ statutory and constitutional challenges to the policies. The plaintiffs filed a reply brief along with evidentiary submissions arguing that the policies indeed were in conflict with each of the statutory and constitutional provisions addressed by the Board defendants in their cross-motion for a summary judgment.
 

 “On March 31, 2008, the trial court heard oral argument on the cross-motions for a summary judgment. The trial court entered an order the next day preliminarily enjoining the Board defendants from implementing the policies.
 
 [7]
 

 “On November 14, 2008, the trial court entered an order granting the plaintiffs’ summary-judgment motion. The trial court held that Policy 609.04 and Policy 220.01 were ‘null and void’ because, it concluded, they had been adopted in violation of the AAPA. The trial court also permanently enjoined
 
 *366
 
 the Board defendants from ‘further implementing and enforcing State Board of Education Policies 609.04 and 220.01 unless and until said policies are promulgated pursuant to the Alabama Administrative Procedure Act’ and from interfering ‘with the flexible schedule arrangements previously approved and permitted for legislators by Postsecond-ary Education Department institutions and programs.’ The Board defendants appeal.
 

 39 So.3d at 1050-52.
 

 On the previous appeal, this Court considered whether the policies violated the Alabama Administrative Procedure Act, § 41-22-1 et seq., Ala.Code 1975 (“the AAPA”). The AAPA requires that certain procedures be followed before an administrative agency adopts a rule. See §§ 41-22-5 and 41-22-23, Ala.Code 1975. As stated in
 
 Byrne,
 
 the parties asserted the following facts to support their relative positions regarding the AAPA:
 

 “The parties agree that Policy 609.04 did away with the existing practice of individual two-year-college presidents permitting employees to work flexible schedules on a case-by-case basis. The Board defendants assert that the Board adopted Policy 609.04 and Policy 220.01 in response to Advisory Opinion No. 2002-28, issued by the Alabama Ethics Commission, which stated that a public employee who is also an elected official must take annual leave, personal leave, or unpaid leave to attend to his or her duties as an elected official. The advisory opinion stated that a ‘flexible schedule’ should be permitted only after leave has been exhausted and only if the public employer has adopted a flexible-schedule policy equally applicable to all employees. The Board defendants argue that Policy 609.04 and Policy 220.01
 
 *367
 
 command or direct the activities of only the employees of the two-year colleges. For example, Policy 609.04 expressly applies to ‘[a]ll Alabama College System employees engaged in outside employment or activities during their normal work hours.’ Policy 609.04 provides a uniform ‘Flexible Work Schedule’ policy for employees of two-year colleges. It supplements, and operates by reference to, existing leave policies such as Policy 611.01, ‘Leaves without Pay,’ and Policy 610.01, ‘Leaves with Pay.’
 

 “Similarly, the Board defendants contend regarding Policy 220.01:
 

 “ ‘Policy 220.01 is merely a personnel policy that by its terms governs only the two-year colleges. Policy 220.01 does not attempt to command or direct the public, or the legislature, to do anything or refrain from doing anything. Policy 220.01 ‘Elected State Officials: Employment Prohibited’ simply designates a group of State employees as ineligible for dual-employment by, or certain contracts with, the two-year colleges.... Certainly nothing in either of the Policies would prevent those who are interested in public education from running for, or holding, any elected office, or from discharging the duties associated with any such office.’
 

 “(Board defendants’ reply brief, pp. 17-18.) Thus, the Board defendants contend that the policies, as personnel or employment policies, govern only the internal management of the two-year-college system and are therefore not ‘rules,’ as that term is defined in the AAPA.
 

 “The plaintiffs contend that the policies at issue in the present case are not solely internal-management policies. They argue that the policies are not analogous to the drug-testing policy at issue in
 
 Wood [v. State Personnel Board)
 
 705 So.2d 413 (Ala.Civ.App. 1997),] because, they contend, Policy 609.04 and Policy 220.01 have a ‘direct impact on the public.’ (Plaintiffs’ brief, p. 41.) Specifically, the plaintiffs contend that those policies will ‘directly affect[ ]’ the number of legislators employed in the two-year-college system and that the composition of the legislature ‘will be forever altered as individuals have to quit their postsecondary jobs because they have, or will, run out of leave necessary to continue their service in the legislature.’ (Plaintiffs’ brief, pp. 42^43.) According to the plaintiffs, Policy 609.04 and Policy 220.01 will affect individual legislators who collectively represent between 500,000 and 600,000 people; thus, the plaintiffs argue, the policies will affect a large segment of the public. The plaintiffs also assert that the policies will affect a number of various alleged ‘private rights.’ ”
 

 39 So.3d at 1055-57.
 

 This Court determined that the policies were “internal-management policies” and thus were not “rules” as defined by the AAPA, '§ 41-22-3(9), Ala.Code 1975.
 
 [1]
 
 Specifically, this Court stated:
 

 “[S]imply because the policies may affect the ability of two-year-college employees to hold outside employment as legislators or to discharge the duties of a second job in addition to their two-year-college employment, it does not follow that the policies affect the public or pri
 
 *368
 
 vate rights in the manner contemplated by § 41-22-3(9)a. or § 41-22-8-(9)c. of the AAPA. Like the policy at issue in
 
 Wood [v. Personnel Board,
 
 705 So.2d 413 (Ala.Civ.App.1997)], Policy 609.04 and Policy 220.01 are ‘not analogous to “legislation applicable to all persons or a relatively large segment of the population outside the context of any specific controversy.” Instead, [they are] more like “administrative activity that has a judicial character” because [they] arise[] out of a specific controversy’— i.e., the pursuit of outside employment by an employee of the two-year-college system or, for example, the decision to forgo employment in the two-year-college system upon becoming an elected official — ‘and address[] personal rights within the context of a personnel action.’
 
 See Wood,
 
 705 So.2d at 417....
 

 “Accordingly, we hold that Policy 609.04 and Policy 220.01 are internal-management policies and as such are exempt from the definition of ‘rule’ in the AAPA. Thus, the trial court erred in holding that the Board was required to follow the AAPA in adopting the policies.”
 

 39 So.3d at 1058. This Court, therefore, reversed the summary judgment for the plaintiffs and, declining to address the non-AAPA challenges that had not been addressed in the trial court’s summary-judgment order, remanded the cause to the trial court for further proceedings. 39 So.3d at 1060.
 

 On remand, the trial court, on the plaintiffs’ motion, entered a temporary restraining order enjoining the defendants from enforcing Policy 609.04.
 
 [2]
 
 The trial court also substituted Freída Hill, Bradley Byrne’s successor, as chancellor of the Department of Postsecondary Education, as a defendant. On February 5, 2010, the trial court held a hearing and received additional evidence from the plaintiffs. That evidence included the deposition testimony of two nonparty State legislators employed by county school systems stating that they disclosed their employment in their campaign materials and discussing how their respective school boards granted them leave to perform their legislative duties; the deposition testimony of a State legislator employed by the Alabama Board of Medical Examiners who opined that his service as a legislator was a political activity; and the deposition testimony of Chancellor Hill regarding how she decided whether to grant leave requests from college presidents and others under her supervision and regarding how she would exercise her judgment in enforcing the policies if given the opportunity.
 

 On May 5, 2010, the trial court entered an order finding 1) that the Board had acted beyond its authority under § 16-60-111.4, Aa.Code 1975, in enacting Policy 609.04 and Policy 220.01; 2) that the policies were invalid because they violated State employees’ right to participate in political activities guaranteed by § 17-1-4, Ala.Code 1975; 3) that, in enacting the policies, the Board had created a qualification for holding public office and therefore had invaded the province of the legislature and violated the separation-of-powers principles stated in Art. Ill, § 43, Ala. Const. 1901; and 4) that the policies were invalid
 
 *369
 
 because they conflicted with the Fair Dismissal Act, § 36-26-100 et seq., Ala.Code 1975. Based on its findings, the trial court declared both Policy 609.04 and Policy 220.01 “void, invalid, and of no legal effect.” The trial court also enjoined the Board defendants from enforcing Policy 609.04 and ordered:
 

 “Defendants, and those acting in concert with them, shall revert to the status that existed prior to the adoption of Rule 609.04, in terms of the existence of a flexible scheduling arrangement that any Legislator-employee worked under, immediately prior to the adoption of Rule 609.04.... If any party or any person acting in concert with a party claims that there has been a material change in the job duties of any Legislator-employee since that time, which would make it appropriate to revisit a particular Legislator-employee’s flexible scheduling arrangement, such party or other person may seek relief from this Court upon presentation of actual evidence of such a material change in circumstances warranting relief; should any person employed by a college seek a new flexible scheduling arrangement for the purpose of serving in the Legislature, the good-faith negotiation about the availability and terms of such an arrangement shall occur at the college level, by personnel who are familiar with the needs of the particular job in question, rather than being controlled by the Board or Chancellor.”
 

 The Board defendants appealed, arguing that each of the trial court’s findings was in error and that the injunctive relief the trial court granted the plaintiffs was overly broad.
 

 Standard of Review
 

 “Our review of a declaratory judgment is generally governed by the ore tenus standard of review. However, in cases such as this, where there are no disputed facts and where the judgment is based entirely upon documentary evidence, no such presumption of correctness applies; our review is de novo. As this Court has stated:
 

 “ ‘A presumption of correctness attaches to a trial court’s judgment based on findings of fact after the court has heard oral testimony without a jury; this is the “ore tenus” rule. However, that rule has no application in this case, because the facts are not in dispute. Therefore, the trial court’s judgment is not entitled to any presumption of correctness.’
 

 “Cincinnati Ins. Co. v. Nelson,
 
 668 So.2d 539, 540 (Ala.1995) (citing
 
 Parker v. Barnes,
 
 519 So.2d 945 (Ala.1988)).”
 

 Alfa Mut. Ins. Co. v. Small,
 
 829 So.2d 743, 745 (Ala.2002).
 

 Analysis
 

 I.
 
 The Board’s Authority Under §16-60-1114
 

 The Board defendants contend that the Board has broad authority to govern and to administer two-year colleges and that it acted within its authority under § 16-60-111.4(1) in enacting Policy 609.04 and Policy 220.01. The Board defendants characterize the policies as employment and personnel policies, citing
 
 Byrne,
 
 supra, and contend that the trial court erred in its construction of § 16-60-111.4(1). The plaintiffs contend that the trial court correctly interpreted § 16-60-111.4(1) as only a narrow grant of authority to the Board not sufficiently broad to include the adoption of the policies at issue here. We must consider whether the authority granted the Board by the legislature is broad enough to encompass the Board’s adoption of Policy 609.04 and Policy 220.01.
 

 
 *370
 
 “Our inquiry is governed by settled principles of statutory construction:
 

 “ ‘ “The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute.
 
 League of Women Voters v. Renfro,
 
 292 Ala. 128, 290 So.2d 167 (1974). In this ascertainment,
 
 we must look to the entire Act instead of isolated phrases or clauses; Opinion of the Justices,
 
 264 Ala. 176, 85 So.2d 391 (1956).”
 

 “
 
 ‘Darks Dairy, Inc. v. Alabama Dairy Comm’n,
 
 367 So.2d 1378, 1380 (Ala.1979) (emphasis added). To discern the legislative intent, the Court must first look to the language of the statute. If, giving the statutory language its plain and ordinary meaning, we conclude that the language is unambiguous, there is no room for judicial construction.
 
 Ex parte Waddail,
 
 827 So.2d 789, 794 (Ala.2001). If a literal construction would produce an absurd and unjust result that is clearly inconsistent with the purpose and policy of the statute, such a construction is to be avoided.
 
 Ex parte Meeks,
 
 682 So.2d 423 (Ala.1996).’
 

 “City of Bessemer v. McClain,
 
 957 So.2d 1061,1074-75 (AIa.2006).”
 

 Bright v. Calhoun,
 
 988 So.2d 492, 497-98 (Ala.2008). Furthermore, this Court has stated that its “role is not to displace the legislature by amending statutes to make them express what we think the legislature should have done. Nor is it this Court’s role to assume the legislative prerogative to correct defective legislation or amend statutes.”
 
 Siegelman v. Chase Manhattan Bank (USA), Nat’l Ass’n,
 
 575 So.2d 1041, 1051 (Ala.1991).
 

 The Board’s authority to govern two-year colleges is found in Title 16, Chapter 60, Article 5. § 16-60-110 et seq., Ala. Code 1975. Section 16-60-111.4 states the powers of the Board as follows:
 

 “The State Board of Education, upon recommendation of the Chancellor, shall be authorized to:
 

 “(1)
 
 Make mies and regulations for the government of each junior college and trade school.
 

 “(2) Prescribe for the junior colleges and trade schools the courses of study to be offered and the conditions for granting certificates, diplomas and/or degrees.
 

 “(3) Appoint the president of each junior college and trade school, each president to serve at the pleasure of the board.
 

 “(4) Direct and supervise the expenditure of legislative appropriations of each junior college and trade school.
 

 “(5) Prescribe qualifications for faculty and establish a salary schedule and tenure requirements for faculty at each junior college and trade school.
 

 “(6) Accept gifts, donations, and devises and bequests of money and real and personal property for the benefit of junior colleges and trade schools or any one of them.
 

 “(7) Disseminate information concerning and promote interest in junior colleges and trade schools among the citizens of Alabama.”
 

 (Emphasis added.) Section 16-60-111.7 provides that, with respect to the appointment of faculty and staff, two-year-college presidents are subject to the regulations adopted by the Board under § 16-60-111.4. In addition to the powers enumerated in § 16-60-111.4, the legislature, in § 16-60-111.8, granted the Board administrative authority to “carry out the intent and purpose” of Article 5.
 

 Section 16-60-111.1 authorizes the Board to appoint a chancellor “[f]or the
 
 *371
 
 sole purpose of assisting the board in carrying out
 
 its authority and responsibility
 
 for each of the junior colleges and trade schools.” (Emphasis added.) Sections 16-60-111.2, -111.5, and -111.6, in describing the authority delegated the chancellor by the Board, elaborate on the authority and responsibility of the Board over the two-year colleges. Section 16-60-111.2 provides: “The authority and responsibility for the
 
 operation, management, control, supervision, maintenance, regulation, improvement, and enlargement
 
 of each of the junior colleges and trade schools shall be vested in the Chancellor,
 
 subject to the approval of the board.”
 
 (Emphasis added.) Section 16-60-111.5 requires the chancellor, among other things, to execute, enforce, interpret, and administer the policies, rules, and regulations adopted by the Board with respect to the two-year colleges. Finally, § 16-60-111.6 requires the Board to delegate authority to the chancellor, stating:
 

 “Except where otherwise clearly indicated herein, the board will delegate to the Chancellor, authority for the Chancellor to act and make decisions
 
 concerning the management and operation of the junior colleges and trade schools.
 
 The president of each junior college and trade school shall be responsible to the Chancellor for the day-to-day operation of each school.”
 

 (Emphasis added.)
 

 By the plain language of these Code sections, the legislature has granted the Board authority to regulate, supervise, and administer the two-year-college system, including authority, through the chancellor as its agent, regarding the management and operation of the two-year colleges. Section 16-60-111.4(1) grants the Board authority to “[m]ake rules and regulations for the government of’ the two-year colleges. Reading the plain language of that provision in context -with the rest of Article 5, see
 
 Bright,
 
 988 So.2d at 497-98, we conclude that the legislature intended to grant the Board the authority to adopt policies such as Policy 609.04 and Policy 220.01.
 

 This Court has already determined that Policy 609.04 and Policy 220.01 are internal-management policies governing the two-year-college system.
 
 Byrne,
 
 39 So.3d at 1058. Policy 609.04 regulates the governance of two-year-college-system employees “engaged in outside employment or activities during their normal work hours” and requires that two-year:college-system employees obtain leave in order to engage in such outside employment or activities. Policy 220.01 regulates, by prohibition, the two-year-college system’s employment of and contracts with elected State officials. Both policies regulate the internal management of the two-year colleges. The policies, therefore, are “regulations for the government of’ the two-year colleges within the meaning of § 16-60-111.4(1). We therefore conclude that the Board acted within its authority under § 16-60-111.4(1) in adopting the policies. This result is neither absurd nor unjust, particularly when read in context with the rest of Article 5. See
 
 Bright,
 
 988 So.2d at 497-98.
 

 The trial court concluded that reading subsection (1) of § 16-60-111.4 broadly enough to encompass the Board’s adoption of the policies would render meaningless the additional powers enumerated in subsection (2) of § 16-60-111.4 — which grants the Board power to prescribe courses of study and conditions for granting certificates, diplomas, and degrees — and subsection (5) — which grants the Board power to dictate faculty qualifications, salary schedules, and tenure requirements. The trial court reasoned that, if the legislature had intended subsection (1) to be a “general
 
 *372
 
 grant of authority over
 
 all
 
 aspects of employment policy at the [two-year] colleges,” it would have had no need to enumerate additional powers in subsections (2) and (5). Because the legislature did state additional powers, the trial court concluded that subsection (1) did “not includ[e] a general and limitless grant of authority over all aspects of employment policy.” Instead, the trial court determined, subsection (1) “has a more limited scope, the precise nature of which does not have to be delineated in this case, beyond the holding that it does not authorize the rules in question here.”
 

 We disagree with the trial court’s underlying premise that a reading of subsection (1) broad enough to encompass the Board’s adoption of the challenged policies requires that the subsection be read as “a general and limitless grant of authority over all aspects of employment policy.” By its plain language, subsection (1) authorizes the Board to “make rules and regulations for the government of’ the two-year colleges. The statute means what it says; the language is unambiguous. The grant of authority regarding rules and regulation for government cannot be construed as duplicating or infringing on the authority granted the Board in subsection (2) regarding courses of study or in subsection (5) regarding faculty qualifications without depriving subsection (1) of a field of operation in matters not directly related to courses of study or faculty qualifications such as are here presented. To do so would require a bald rewriting of an unambiguous statute under the guise of statutory construction. This we cannot do. See
 
 Siegelman,
 
 575 So.2d at 1051. The trial court’s failure to explain the more limited scope of subsection (1) other than to say it does not authorize the policies in question in this proceeding signals the difficulty in doing so without rewriting the statute. The trial court erred in concluding that the Board lacked authority under § 16-60-111.4(1) to adopt Policy 609.04 and Policy 220.01.
 

 II.
 
 Political Activity Protected by § 17-1-b
 

 The Board defendants next argue that the trial court erred in concluding that holding office as a State legislator is a “political activity” protected by § 17-1-4, Ala.Code 1975, and that the policies, therefore, violate that section. Section 17-1-4(a)(3) states, in part:
 

 “No person in the employment of the State of Alabama, whether classified or unclassified, shall be denied the right to participate in city, county, or state political activities to the same extent as any other citizen of the State of Alabama, including endorsing candidates and contributing to campaigns of his or her choosing.”
 

 We must consider whether the protection of political activity in § 17-l^l(a)(3) is broad enough to preclude the Board a) from adopting a policy requiring two-year-college employees to engage in outside employment only by using annual, personal, or unpaid leave or b) from choosing not to employ or to contract with elected State officials. The definitions section of Title 17 does not define the terms “deny,” “right,” “participate,” or “political activities.” See § 17-1-2, Ala.Code 1975. Therefore, our inquiry is governed by the same settled principles of statutory construction stated above.
 

 We must ascertain the legislative intent of § 17 — 1—4(a)(3), looking first to the language of the statute and considering the “ ‘ “entire Act instead of isolated phrases or clauses.”’”
 
 Bright,
 
 988 So.2d at 497 (quoting
 
 Darks Dairy, Inc. v. Alabama Dairy Comm’n,
 
 367 So.2d 1378, 1380 (Ala. 1979) (emphasis omitted)). “ ‘If, giving the
 
 *373
 
 statutory language its plain and ordinary meaning, we conclude that the language is unambiguous, there is no room for judicial construction.’ ”
 
 Bright,
 
 988 So.2d at 498 (quoting
 
 City of Bessemer v. McClain,
 
 957 So.2d 1061, 1074 (Ala.2006)). Finally, our “role is not to displace the legislature by amending statutes to make them express what we think the legislature should have done.”
 
 Siegelman,
 
 575 So.2d at 1051.
 

 Policy 609.04 requires two-year-college employees to obtain leave in order to engage in outside employment or activities during normal work hours. Section 17-1-4(a)(3) prohibits the “deni[al of] the right [of State employees] to participate in city, county, or state political activities to the same extent as any other citizen of the State of Alabama.” Policy 609.04 does not deny two-year-college employees the right to participate in political activities; it merely requires that they obtain leave in order to do so during normal work hours. The restriction is no greater than that that may be imposed on employees in the private sector. Indeed, we have not found, nor have the parties presented, any authority limiting an employer’s ability to require its employees to obtain leave before participating in outside activities, including political activities, during normal work hours. Section 17-l-4(a)(3) does not afford preferential treatment for State employees with respect to participation in political activities; by its terms it relegates State employees to the same status enjoyed by citizens who are not State employees. Accordingly, under Policy 609.04, two-year-college employees may participate in political activities to the same extent as any other citizen. On its face, therefore, Policy 609.04 does not violate § 17-l-4(a)(3). Its application under facts suggesting disparate treatment of State employees under circumstances where non-State employees have greater rights is not here presented.
 

 Policy 220.01 prohibits the Board and the two-year colleges from “employ[ing] any elected state official” and from “entering] into any personal or professional services contract under which services are to be performed by an elected state official.” As to existing employees, the policy provides: “An employee who is elected or re-elected to an elected state office after the effective date of this policy must submit his or her resignation effective on or before taking office.” As with Policy 609.04, Policy 220.01 does not deny two-year-college employees the right to participate in political activities; it merely requires that they not work for the Board or the two-year-college system while holding an elected State office. Again, we have not found, and the parties have not presented us with, any authority limiting a private employer’s ability to limit its contracts to the same extent. Nor have we found any authority granting citizens the right to simultaneously hold both elected office and the employment of their choice. Accordingly, we cannot say that Policy 220.01 denies two-year-college employees the right to participate in political activities to the same extent as any other citizen.
 

 Based on the foregoing, we conclude that the trial court erred in holding that Policy 609.04 and Policy 220.01 violated § 17-l-4(a)(3).
 

 III.
 
 Separation of Powers Under Art. III, § 43, Ala. Const. 1901
 

 The Board defendants contend that the trial court erred in concluding that the policies violate the separation of powers required by Art. III, § 43, Ala. Const. 1901.
 
 [3]
 
 The trial court reasoned that, in
 
 *374
 
 adopting Policy 220.01, the Board created a new qualification for legislators — that they not be employed by the Board or by a two-year college — and, therefore, invaded the province of the legislature. The trial court reasoned that Policy 609.04 similarly violated separation-of-powers principles by indirectly creating the same new qualification for legislators. Citing
 
 Byrne,
 
 supra, the Board defendants argue that the policies are internal-management policies and do not impose any new qualifications regarding who may serve as a legislator.
 

 The parties have not referenced any authority from this Court addressing the question presented: Whether a policy or rule requiring that an employee of a government agency resign in order to hold an elected office creates an impermissible qualification regarding who may hold that elected office. The Board defendants refer to several decisions from other jurisdictions addressing similar questions, citing, e.g.,
 
 Holley v. Adams,
 
 238 So.2d 401 (Fla. 1970);
 
 Jones v. Board of Control,
 
 131 So.2d 713 (Fla.1961);
 
 Mulholland v. Ayers,
 
 109 Mont. 558, 99 P.2d 234 (1940).
 

 In
 
 Jones v. Board of Control,
 
 the Board of Control, which governed the operation of state universities in Florida, imposed a rule stating that its employees were “ ‘prohibited from seeking election to public office’ ” and stating that “ ‘[a]ny employee desiring to engage in a political campaign for public office shall first submit his resignation to the Board.’ ” 131 So.2d at 715. Jones, a law professor at the University of Florida, was dismissed for violating the above-quoted rule when he sought nomination for the office of circuit judge. Jones challenged his dismissal and the validity of the rule. Ultimately, the trial court determined that the rule was valid and upheld Jones’s dismissal. On appeal, the Florida Supreme Court considered, among other arguments, Jones’s argument that the rule denied him substantive due process by unreasonably interfering with what Jones characterized as his right to work and earn a living as a teacher. The Florida Supreme Court disagreed with Jones, stating:
 

 “[The rule] dealt merely with his right to teach and simultaneously carry on a political campaign for an elective public office. The rule prohibits no one from teaching. Neither does it prohibit a teacher from running for public office. It merely provides that he cannot do both
 
 simultaneously.
 
 There is adequate justification for the rule in the public interest, as well as in the interest of the University student body which looks to its professors for instruction.”
 

 131 So.2d at 718 (emphasis added). Analyzing the policy reasons underlying the rule, the Florida Supreme Court determined that the rule was not unconstitutional.
 

 Subsequently, in
 
 Holley v. Adams,
 
 the Florida Supreme Court considered a challenge to Ch. 70-80, Laws of Florida, which provided, in part:
 
 “ ‘No
 
 individual may qualify as a candidate for public office who holds another elective or appointive office, ... the term of which or any part thereof runs concurrent to the term of office for which he seeks to qualify without resigning from such office....’” 238 So.2d at 403. Noting that “[djecisions in other jurisdictions concerning th[e] question [whether such a statute is an impermissible qualifi
 
 *375
 
 cation for holding office] are in conflict,” 238 So.2d at 405, the Florida Supreme Court concluded, based in part on its reasoning in
 
 Jones v. Board of Control,
 
 that the Ch. 70-80 did not create an additional qualification for holding office. The court stated:
 

 “Ch. 70-80 does not prescribe additional qualifications for the office, as the candidate may well be qualified in a legal sense to hold either. The law is simply a limitation upon the right to retain the office already held when seeking another.
 
 It is not a limitation upon the right to seek another office, for the incumbent of an office has the choice under the statute to retain it unmolested or give it up and seek another.”
 

 238 So.2d at 406 (citing
 
 Mulholland v. Ayers,
 
 109 Mont. 558, 99 P.2d 234 (1940) (emphasis added)).
 

 In
 
 Mulholland v. Ayers,
 
 the Montana Supreme Court considered whether a state senator had a right to become a candidate for another office under an act that, as summarized by the court, provided
 

 “that whenever any person holding any office under the laws of the state, the term of which is longer than two years, shall become a candidate for election to any elective office, other than for reelection to the office held by him, he shall resign the office held by him, and if he fails to do so the office shall become vacant and unoccupied ipso facto.”
 

 109 Mont, at 560-61, 99 P.2d at 236. In determining whether the act conflicted with a provision of the state constitution stating the qualifications for holding state office, the Montana Supreme Court reasoned:
 

 “The requirement that the holder of a public office must tender his resignation upon becoming a candidate for another office, or that his filing for another office would work a resignation ipso facto, does not prescribe additional qualifications for the office....
 
 A person may possess the requisite qualifications or may be eligible to many different offices. The legal requirement, however, that he may not hold more than one at a time does not affect his eligibility to hold them all.
 
 On the other hand, the requirement that an office held by one who becomes a candidate for another becomes vacated goes not to his eligibility to hold either office. He is still qualified in the legal sense to hold either.
 
 [The act] is simply a limitation upon the right to retain the office already held when seeking another. It is not a limitation upon the right to seek another office. The incumbent of an office has the choice under the statute to retain it unmolested, or give it up and seek another.”
 

 109 Mont, at 565-66, 99 P.2d at 239 (emphasis added). Based, in part, on this reasoning, the court determined that the senator could “not become a candidate ... for an office to be filled at the general election ... without such candidacy working a resignation or abandonment of his office of state senator.” 109 Mont, at 568, 99 P.2d at 240.
 

 The plaintiffs have not responded to or distinguished any of these cases cited by the Board defendants. Our own research as determined that, in addition to the courts in Florida and Montana, courts in West Virginia and Oklahoma have reached similar results using similar reasoning. In
 
 Oklahoma State Election Board v. Coats,
 
 610 P.2d 776, 777-78 (Ok.1980), the Oklahoma Supreme Court considered whether a statute “preclud[ing] district attorneys from running for any office which has a term, any portion of which is the same as the term for which the district attorney is elected” prohibited a district attorney from running for the United States Senate.
 
 *376
 
 Coats, the district attorney, argued that the statute was “inapplicable [to him] because it added qualifications not imposed by ... the United States Constitution.” 610 P.2d at 778. The Oklahoma Supreme Court concluded: “Under the facts as presented, we find that the statute ... does not impose additional qualifications on the candidacy of district attorneys who choose to run for a federal public office.” 610 P.2d at 780. The court reasoned:
 

 “The statute imposes an impediment to those who seek to remain in office and simultaneously run for another office. The impediment, however, attaches to the office and not to the officeholder. One who gains an elective public office is not legally committed to finish the term. The officeholder may resign or retire at any time he chooses. At the point of resignation, the officeholder is no longer the district attorney; and because he meets all the necessary criteria for a United States senator, he is then an eligible candidate.”
 

 610 P.2d at 780.
 

 In
 
 Philyaw v. Gatson,
 
 195 W.Va. 474, 475, 466 S.E.2d 133, 134 (1995), the Supreme Court of Appeals of West Virginia considered an administrative policy that prohibited judicial employees “from becoming a candidate for a non-judicial office.” The employee resigned her employment in order to become a candidate for circuit clerk. She subsequently contended that she was entitled to workers’ compensation benefits because she was improperly forced to resign from her position. A board of review determined that the employee’s resignation was voluntary; the circuit court reversed the board’s decision. On appeal, the West Virginia Supreme Court of Appeals stated:
 

 “The circuit court, in reversing the Board of Review[,] interpreted the resign-to-run requirement as an unconstitutional qualification for candidates seeking office under
 
 Marra v. Zink,
 
 163 W.Va. 400, 256 S.E.2d 581 (1979) (declaring unconstitutional a city charter which required candidates for city council to be city residents for one year as an additional qualification for a municipal office, under W. Va. Const, art. IV, § 4). We believe that the circuit court’s reliance on
 
 Mavra
 
 is misplaced since the resign-to-run rule does not impose an additional qualification on a candidate. The employer did not alter the
 
 qualifications necessavy to run for office,
 
 but rather established
 
 requirements for retaining employment.
 
 The claimant’s employment was conditioned upon a reasonable restriction, which because of the unique nature of the employment would not be imposed on employees in the private sector. This extension of the resign-to-run requirement to judicial employees is designed as a prophylactic measure to protect the entire judicial branch. This rule is a legitimate and independent condition of claimant’s continued employment with the Judiciary. We hold the restriction on judicial employees requiring their resignation upon becoming a candidate for a non-judicial office is reasonable.
 
 [8]
 

 
 *377
 
 195 W.Va. at 478-79, 466 S.E.2d at 187-88 (emphasis in original).
 

 Rejecting the employee’s argument that her resignation was obtained at the fault of her employer, the court stated: “The claimant’s argument must fail because she had the opportunity to choose between running for elective office or retaining her employment. The limitation on the claimant was a constraint on her employment as a result of a reasonable condition of employment and not on her right to seek elective office.” 195 W.Va. at 479, 466 S.E.2d at 138. Accordingly, the court determined that the employee was not entitled to workers’ compensation benefits.
 
 [4]
 

 We note that other courts have reached different conclusions based on the particular wording of the statutes at issue before them. See, e.g.,
 
 Moore v. Knightdale Bd. of Elections,
 
 331 N.C. 1, 413 S.E.2d 541 (1992);
 
 Whitney v. Bolin,
 
 85 Ariz. 44, 48, 330 P.2d 1003, 1005 (1958);
 
 Burroughs v. Lyles,
 
 142 Tex. 704, 181 S.W.2d 570 (1944). However, considering the language of Policy 609.04 and Policy 220.01, we find the reasoning of the Florida, Montana, Oklahoma, and West Virginia courts persuasive.
 

 The policies do not regulate or limit who may serve in the legislature. Indeed, as the Board defendants correctly note, a legislator qualified under Art. IV, § 47, Ala. Const. 1901, may not be disqualified from serving in the legislature based on Policy 609.04 or Policy 220.01. Likewise, the policies do not prohibit two-year-college employees from running for elected State office. Rather, they prohibit two-year-college employees from
 
 simultaneously
 
 being employed by the two-year-college system and holding an elected State office. See
 
 Jones,
 
 131 So.2d at 718.
 

 In adopting the policies, the Board “did not alter the
 
 qualifications necessary to run for office,
 
 but rather established
 
 requirements for retaining employment”
 
 with the two-year-college system.
 
 Philyaw,
 
 195 W.Va. at 478-79, 466 S.E.2d at 137-38.
 
 [5]
 
 The policies, like the legislative act at issue in
 
 Mulholland,
 
 are “simply a limitation upon the right to retain the [employment] already held when seeking [an elected state office]. It is not a limitation upon the right to seek ... office.
 
 The [employee] has the choice under the statute to retain [employment] unmolested, or give it up and seek [elected state office].”
 
 109 Mont. at 566, 99 P.2d at 239 (emphasis added).
 

 The trial court therefore erred in concluding that the policies impose a new qualification on the right to hold legislative office. As a result, the trial court also erred in concluding that the Board invaded the province of the legislature in violation
 
 *378
 
 of the separation-of-powers provision in Art. III, § 43, Ala. Const. 1901.
 

 IV.
 
 The Fair Dismissal Act
 

 Finally, the Board defendants contend that the trial court erred in concluding that the policies violate the Fair Dismissal Act, § 36-26-100 et seq., Ala.Code 1975. Section 36-26-102 of the Act states that nonprobationary employees
 

 “shall ... not be
 
 terminated
 
 except for failure to perform his or her duties in a satisfactory manner, incompetency, neglect of duty, insubordination, immorality, justifiable decrease in jobs in the system, or other good and just causes; provided, however, such termination of employment shall not be made for political or personal reasons on the part of any party recommending or voting to approve said termination.”
 

 (Emphasis added.) The trial court concluded that Policy 220.01 violated the Fair Dismissal Act because it required employees to resign and that Policy 609.04 created an irreconcilable conflict between an employee’s legislative duties and his or her job performance. Accordingly, the trial court reasoned that the policies result in the termination of employees for reasons other than those stated in § 36-26-102. We disagree.
 

 Again, we consider the plain language of the statute in determining legislative intent. See
 
 Bright,
 
 988 So.2d at 497-98. Section 36-26-102 regulates the
 
 termination
 
 of employment. Policy 609.04 requires two-year-college employees to obtain leave in order to engage in outside employment or activities during normal work hours. Nothing in Policy 609.04 relates to the termination of any employee. Accordingly, nothing in that policy violates the Fair Dismissal Act.
 

 Policy 220.01 provides: “An employee who is elected or re-elected to an elected state office after the effective date of this policy must submit his or her resignation effective on or before taking office.” By this language, Policy 220.01 does not categorically require the termination of any employee. Rather, it requires the employee’s resignation, effective on or before taking an elected State office,
 
 only
 
 after the employee’s voluntary decision to hold such office. As stated above, we have not found any authority granting citizens the right to simultaneously hold both elected office and the employment of their choice. Under Policy 220.01, the employee may choose to retain his or her employment or to give it up in favor of an elected State office. See
 
 Coats,
 
 610 P.2d at 780;
 
 Holley,
 
 238 So.2d at 406;
 
 Mulholland,
 
 109 Mont, at 565-66, 99 P.2d at 239. Because that choice is voluntary, Policy 220.01 does not result in the termination of an employee who chooses to take public office. Accordingly, Policy 220.01 does not violate the Fair Dismissal Act.
 

 Conclusion
 

 Based on the foregoing, the trial court erred in declaring Policy 609.04 and Policy 220.01 void and in enjoining the Board defendants from enforcing them. We, therefore, reverse the trial court’s judgment.
 

 REVERSED.
 

 WOODALL, STUART, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.
 

 COBB, C.J., recuses herself.
 

 [1]
 

 " 1 The two-year-college system was previously known as the 'Alabama College System’; it has been renamed the 'Alabama Community College System.’
 

 [2]
 

 " 2 Policy 611.01, adopted in 1994, requires an employee seeking unpaid leave to obtain the consent of the president of the college at which the employee is employed and the consent of the chancellor of the Department of Postsecondary Education.
 

 [3]
 

 "3 Policy 220.01 defines an 'elected state official' as ‘[a] person elected to a statewide office by a vote of the people and any member of the State Legislature. The term also includes any person appointed to any of these offices to fill a vacancy.'
 

 [4]
 

 " 4 The plaintiffs are Representative Blaine Galliher; Representative Thomas Jackson; Representative Terry Spicer; Thomas D. Der-mody; Freddie Williams, Jr.; Senator Linda Coleman; Representative Merika Coleman; and James P. Wrye. Former Representative Laura Hall was, but no longer is, a plaintiff.
 

 [5]
 

 " 5 Byrne resigned as chancellor of the Department of Postsecondary Education effective May 28, 2009. Rule 43(b), Ala. R.App. P., states:
 

 " 'When a public officer is a party to an appeal or other proceeding in the appellate court in that officer's official capacity, and during its pendency dies, resigns, or otherwise ceases to hold office, the action shall not abate and the public officer’s successor is automatically substituted as a party.'
 

 "Rule 43(c), Ala. R.App. P., states: 'An order of substitution may be entered at any time, but the omission to enter such order shall not affect the substitution.'
 

 [6]
 

 " 6 The members of the Board at the time the action was filed were Governor Bob Riley; Randy McKinney; Betty Peters; Stephanie W. Bell; Dr. Ethel H. Hall; Ella B. Bell; David F. Byers, Jr.; Sandra Ray; and Dr. Maiy Jane Caylor.
 

 [7]
 

 "7The Board defendants appealed to this Court challenging the preliminary injunction; that appeal was docketed in this Court as case no. 1070979. Upon the record being certified as complete in that appeal, however, the parties jointly moved this Court to remand the case for the trial court to enter a final judgment on the merits. On August 8, 2008, this Court remanded the case to the trial court, and the appeal in case no. 1070979 was stayed. This Court received notice on December 22, 2008, of the entiy of a final judgment by the trial court, and on December 28, 2008, the appeal in case no. 1070979 was dismissed as moot.”
 

 [1]
 

 . Section 41-22-3(9) states the following exemption from the definition of the term "rule”: "The term ... does not include ... [statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public.”
 

 [2]
 

 . The original plaintiffs were Representative Blaine Galliher; Representative Thomas Jackson; Representative Terry Spicer; Thomas D. Dermody; Freddie Williams, Jr.; Senator Linda Coleman; Representative Merika Coleman; and James P. Wrye. On the plaintiffs' motion, and without objection from the Board defendants, Representative Spicer and Representative Jackson were dismissed as plaintiffs and Representative Todd Greeson, Senator Quinton Ross, Representative Randy Hin-shaw, Representative John Gill Page III, and Representative Pebblin Warren were added as plaintiffs.
 

 [3]
 

 . Article III, § 43, Ala. Const. 1901, provides:
 

 "In the government of this state, except
 
 *374
 
 in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.”
 

 [8]
 

 “ 8 This conclusion is consistent with cases decided by the United States Supreme Court considering resign-to-run requirements. See, e.g.,
 
 Clements v. Fashing,
 
 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (upholding a ‘resign-to-run’ provision, which required public employees to resign their positions with state government before running for a political office);
 
 United States Civil Serv. Comm'n v. National Assoc. of Letter Carriers,
 
 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (superseded by statute as stated in
 
 Bauers v. Cornett,
 
 865 F.2d 1517 (8th Cir. 1989) (finding constitutional the requirement that federal employees could not take an active part in political management, including becoming a candidate for an elective public
 
 *377
 
 office));
 
 Broadrick v. Oklahoma,
 
 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (upholding a state statute requiring resignation from a classified service employee who becomes a candidate for nomination or election to any paid public office).”
 

 [4]
 

 . See also
 
 State ex rel. Carenbauer v. Hechter,
 
 208 W.Va. 584, 596, 542 S.E.2d 405, 417 (2000) ("Contrary to the position advanced by Justice McGraw, no additional qualification for office will be imposed by restricting when a sitting supreme court justice, whose term has not expired, may seek a new term on this Court. The fundamental qualifications required to seek a seat on this Court are not affected by prohibiting Justice McGraw from seeking a second seat on this judicial body at this juncture in his currently unfulfilled term. What this Court is being forced to do, solely in response to the unprecedented candidacy undertaken by Justice McGraw, is to impose a restriction which affects eligibility for election to this body,
 
 not
 
 the qualifications for holding a seat on this tribunal.” (footnote omitted)).
 

 [5]
 

 . This conclusion is consistent with this Court's previous determination in
 
 Byrne,
 
 supra, that the policies are internal-management policies.